United States v. Cohan and Carr v. United States. United States v. Cohan and Carr v. United States. Ms. Rasmussen, I'm here to argue on behalf of Petitioner Robert Carey in the mandamus matter, which is second on calendar, consolidated with the first one. Is that the proper pronunciation, Carey? Carey, yes, it is. Is that okay with the Court? Does the Court have any objection to me proceeding first? And we have tentatively planned that I would spend about 13 minutes total. Ms. Panagakos, who's also here at counsel table, as is Mr. Cohan, would spend 7 minutes. And I'd like to spend 9 and reserve 4 for rebuttal. Okay. You're going to have to help keep track of your own time. Yes, I will. I'll do my very best. Thank you. This case started in the district court. It's a tax case with 23 defendants. Ultimately, 13 of those defendants pled guilty, and 9 defendants went to trial. Another one was severed. So that was the breakdown of how we proceeded to trial in May of 2007. When we went to trial, I was counsel for Mr. Axberg, and I was actually — there was another lawyer who came in to do the entire trial for Mr. Axberg. At that point, I had taken a reduced role, and I referred to myself sometimes as the den mother. But I did global coordinating activities. I worked with all of the exhibits. I did things that benefited the entire defense. I arranged for an expert who came in and sat with us at trial and helped us pull up exhibits. There were a million — about a million pages of discovery in this case, or slightly less than that. It was large and unwieldy. So for that reason, I think — Even with your description, it's not quite clear to me your role. Now, you were appointed by the court, and you had — and you were not retained by anybody. Whatever you were doing, you were doing there because you were appointed by the court. That's correct. And you were appointed because a specific defendant qualified for your service, and that was the gentleman you mentioned. That's correct. Now, how did you take on the role that you've described? Was that all with approval of the court, or did you just fall into it, so to speak? It was, and it's a good question. I initially was appointed to represent Mr. Axberg when all of the defendants were charged and indicted in April 2005. And I represented Mr. Axberg exclusively. And most of the defendants, I might add for the Court's clarification, were represented by appointed counsel, with the exception of a few. And I continued to represent Mr. Axberg, and then I think it's probably somewhat evident, but I'll elaborate on it. My law firm merged with a larger law firm, and they had asked me to phase out my appointed criminal cases, which I started doing that in January 2007. I didn't take any more cases, and I was working to finish up what I had. When it became clear that this case was going to go to trial, and that it was going to be several months, in fact, it lasted four months, I asked, because I was already doing all of the administrative work in addition to representing my defendant, I had taken on large duties in addition to that, if I could take a reduced role. And the district court approved that, because we found another lawyer who was willing to come in and do the trial with Mr. Axberg. That's how that happened. Roberts. Okay. So whatever you did was with approval of the Court. It was. All right. And, in fact, there was every time I appeared for another defendant, because I filled in, I think it's obvious from the record, we submitted it in the reply, every time I appeared, whether I did something substantive or not, the Court made sure that that defendant agreed with it and that they were okay with it. So that's how we started. What's at issue before you today is whether or not I can be local counsel for Mr. Carey in this case. My former client, Mr. Axberg, was acquitted. He was charged with nine counts. He's no longer a defendant. None of the defendants that I ever appeared on behalf of, however fleetingly, are being tried in what's now the third superseding indictment and the remainder trial in this case. No one was convicted in the first trial. Of all nine people, several were acquitted. None of the people that I who – on whose behalf I appeared are in the second trial. The Court has not identified, nor has the government, what the conflict is. I still don't know what the conflict is. Nobody has identified how there is even a potential conflict. The government has merely stated in when they came to the motion for reconsideration hearing on March 6th, we agree with the Court because of the conflict. What is the conflict? The Court has stated that I represented a prior defendant. Certainly that's true. There's no doubt about that. The Court has stated that I was CJA counsel for the prior defendant. That's also true. But there's no authority that says that when I'm CJA counsel and that case is complete, I can't later be retained by another defendant. There's simply no proposition for that. There's no authority that supports that proposition. The Court has alleged that I have somehow engaged in misconduct. Well, back on the conflict issue, what about the district court's reference to the joint defense agreement and the district court's observation, as reflected on the record, that in his opinion counsel appeared to be sharing confidential information? I'd be happy to address that. The joint defense agreement, the government requested before we went to trial, and we produced it to the district court. I did that. That was another one of the kinds of administrative things that I did. I gave it to the district court. He reviewed it, didn't see that there was any problem with it. But before we started trial, each defendant was canvassed individually out of the presence of the other defendants. Do you realize you're part of a joint defense agreement? Do you realize that there could be a potential conflict? Do you believe there's a conflict? The district court made that canvass with regard to every defendant. So if there had been an issue, it wouldn't apply just to me in this circumstance. It would have applied to all counsel. The joint defense agreement doesn't pledge loyalty. It's basically the whole purpose of it. It was submitted in camera to this Court, was to protect our defense investigation from the government. If a defendant pled guilty, it was to ensure that he wouldn't take everything that he might have gained from our joint common front defense and give it to the government. It was to protect the defendants from the government, not to prevent people from coming to court and testifying and that information to be used as a means of cross examination against them at trial. That was never the purpose of it. The district court didn't, in fact, have an issue with the joint defense agreement. Who had been representing Poser? Mr. Poser was represented, I have to think because there were so many of us, by Todd Leventhal. No. What? That's not correct. Mr. Whitney was represented by Todd Leventhal. Mr. Poser was represented by counsel, and I just cannot remember off the top of my head who it was. There were so many lawyers, and I – it starts to run together. Well, when you made these appearances representing everyone, did that include Poser? No. Mr. Poser pled guilty. There were five – And that happened – that happened previous to any of the events that are relevant here. Yes. There were five defendants who came to trial and testified as government witnesses. They were Heidi Rasmussen-Molesworth, she changed her name, Dick Poser, William Whitney, James Gulley, and George Rodriguez. All of them pled guilty before the trial started. I never represented any of those people. And there's never been any evidence that confidential communication was ever shared or used in cross-examination at trial. In fact, the district court cites in its response to this Court, the best example it could think of was Mr. Whitney. I submitted to this Court the transcript, and it's from March 13th. It's submitted to this Court as Exhibit T to the motion for reassignment upon remand, the coloquy that followed the response to this Court when the district court actually canvassed Mr. Whitney, which was on March 13th. And Mr. Whitney said, no, he had never given confidential information to any of the other lawyers in this case. No, it had never been used against him at trial for the purpose of cross-examination. That was simply not an issue. And how this became an issue with regard to whether or not I can be local counsel for Mr. Carey, I don't know. I didn't even cross-examine Mr. Poser. That's the subject of the contempt issue that Ms. Panagakos will address. I think I'm running low on time. With the Court's permission, I'd like to yield to Ms. Panagakos. Roberts. I have only one question. There's reference in here that Mr. Axberg has consented to all of this. Now, that's not in the record. Is there a formal consent by him in this record? Thank you for asking. I contacted him by telephone. He lives in a somewhat remote rural area about an hour outside of Las Vegas. I contacted him by telephone on the 29th of February, or the 28th, actually, before I entered the appearance for Mr. Carey to discuss with him the — that I was contemplating acting as local counsel for Mr. Carey, explained to him what that could potentially mean for him, asked him if he had any objection. He, in fact, did not. I told him I was mailing him a consent form, and then on the following Monday, March 3rd, the district court struck my appearance at a hearing when I wasn't present. I filed the motion to reconsider on the 4th. What you have is Mr. Carey's portion of the signature, but also my declaration saying that I had spoken with him, that he consented and did not have any issue with it. And you are stating there's no serious potential of conflict. That's correct. Mr. Axberg would be a defense witness if he were to come to trial and testify. There's no potential to be cross-examined. The government has never said that they're going to call him as a witness. They're simply unlike wheat. There's no potential for it here. And you've advised the district court, am I correct, that you did not receive any confidential communications from any other defendant? Yes. I've advised the district court of that in my declarations and affidavits that are all submitted and before this Court. But I — the district court, I think this Court should know, when he held the hearing on my motion to reconsider on March 6th, would not let me speak, would not be — let Mr. Carey be heard. He would only give his reasons on the record, wouldn't let me respond to them, and then he wanted to hear from the government. So there was no opportunity to be heard. Thank you, Your Honor. My name is Lynn Panagakis, and I represent Mr. Cohan on the appeal of Mr. Cohan's contempt conviction. Under this Court's recent decision of December 26, 2007, United States v. Cohan, the summary contempt conviction here must be vacated because there is no Rule 42B certificate. That — what's being put on the board is a quote of the alleged contemptuous cross-examination. That's the only thing that's at issue that was found contemptuous, and given its original purpose, it's not on the board. But in the absence of the summary contempt conviction, the certificate, the 42B certificate, the conviction must be vacated. So the question is whether to dismiss or whether to remand. And we're asking for dismissal because we believe that it's clear that the conduct at issue here is not contemptuous as a matter of law and as a matter of fact. The conduct that was found contemptuous was four questions that were asked on the cross-examination of cooperating government witness Richard Poser, who was represented by Attorney Mr. McNicholas. The questions — this is it, 13 lines of transcript over the course of a four-month trial. The questions have to do with whether or not a $250,000 loss that Mr. Poser testified about on direct examination, testimony elicited by the government, Mr. Cohan asked whether that loss might be deductible, might be deductible. The Court found that the questions were contemptuous because they were misleading and they were intentionally misleading. That finding has absolutely no support in the record. The only way that that $250,000 loss would have not been deductible — he found it was misleading because the loss was not deductible. That's what the district court found. The only way the loss about which Mr. Cohan was asking the witness would not have been deductible is if Poser Electric was a C corporation. There's still no evidence in the record that Poser Electric was a C corporation. So there's no basis for finding that those questions were misleading. What about the judge's statement at the contempt hearing, which appeared to add an additional accusation, stating that, quote, appellate — stating appellant, quote, intended not only to go into an area that the court had already forbidden him from going into, but also intentionally to mislead? And then, as you know, at the close of the contempt hearing, the district court not only referred to intentional contempt of court by misleading the court and the jury, but the district court also referred to and made a finding regarding Mr. Cohan's intentional strategy to provoke the court by going beyond the court's This cross-examination did not violate a court ruling. The court ruling was that Mr. Cohan could not attack the validity of the plea agreement and thereby suggest some deception on the part of the government or the court. Mr. Cohan never, ever suggested court deception or government deception. These questions, on their face, don't attack the plea agreement. They probe matters elicited on direct examination. We have an absolute right on cross. It's protected under the Sixth Amendment to probe matters elicited on direct. On direct, the witness testified he had a $250,000 loss from his own business. On direct, the witness testified that he had a $47,000 tax liability in years 2001 through 2005. This cross-examination probes that direct testimony. It didn't attack the plea agreement. Now, the ruling also allowed Mr. Cohan to use the plea agreement to attack credibility. These questions attacked Mr. Poser's credibility. Importantly, Your Honor, before this line of questioning, at page 47 of the excerpt when the background for this begins, Mr. Cohan offered the amended tax returns. Which this cross-examination went to. The government objected on relevance grounds. That objection was overruled. The court admitted the returns and permitted questioning about them. Sotomayor, I understand your focus on this part of it. But that was preceded, was it not, by the questions that said, you signed the plea memorandum and pled guilty? Did you understand you had to tend to break the law before you would be guilty of tax evasion? Was that made clear to you? Not really. That's why I talked to my attorney and he did a print. I said I really wasn't aware of that until I spoke with my attorney. And he said if you don't file, it's a felony. And I didn't file for five years. And then the question, well, that's not correct. You have to willfully engage in conduct. Well, so when you take it all together, you get, don't you, a kind of trying to show that he didn't commit a crime at all. Your Honor, the rulings – I'm pressed for time and my counsel needs some rebuttal. The rulings and the line went like this. Mr. Cohan on page 44 moved to admit the plea agreement. The Court said, no, he won't allow admission of the plea agreement, but he will allow statements made or read by Mr. Poser. This continues. He will allow cross-examination on credibility. That's on page 45, down at the bottom of page 45. Mr. Cohan says, you know, the Court says he can question about statements, he can question about things that Mr. Poser relied on. Mr. Cohan moved to admit the plea agreement and get rulings as to which parts he could ask about and which parts he couldn't. That's at page 45, lines 9 through 11. The Court denied that request. Mr. Cohan said he wants to be able to inquire without running afoul of the rulings. The Court said, no problem. The rulings are then that Mr. Cohan's faith. Well, normally a credibility ruling means when you use something for credibility, you use it to show that they've been they've pled to this crime and that that has some that shows that they're not very credible people. He pled tax evasion. It doesn't mean that you can ask questions that indicate that you never did that. Well, on direct examination, the government elicited testimony that Mr. Poser pled guilty to tax evasion, and then the government elicited testimony that was inconsistent with the plea. The government elicited that he pled guilty to tax evasion, yet his failure to file was based on his belief that he wasn't required to file, on his belief that he didn't meet the threshold, on his belief that the coins should be valued at face value. That testimony elicited on direct was inconsistent with the plea, and Mr. Cohan had a right to probe those inconsistencies. So he was faced with that contradictory ruling, and given that this is a criminal contempt conviction and that the violation has to be willful and the ruling has to be clear, we don't think the evidence is sufficient. In fact, the ruling wasn't made clear until after that cross-examination, and that's on page 56, when 55 and 56, when the Court clarified its ruling, you can use the plea agreement to question about credibility. You can't, on page 56, use the plea agreement to infer government or court deception. Mr. Cohan never, ever made that suggestion. The question was that he may have pled guilty as a result of mistake, and the testimony was directly relevant, separate from attacking the validity of the plea agreement, to undermine and show the inconsistency with the testimony on direct that Mr. Poser testified that he was an employee, not an independent contractor, that he was knowledgeable about tax law sufficient to make a critical aspect of the government's case. This went to undermine that and was within the scope of the ruling. Thank you, Your Honor. May it please the Court, Your Honors, my name is Jed Dwyer and I represent the United States, the real party and interest in the mandamus action. Your Honors, the petition for the writ of mandamus should be denied. The defendants, the Petitioner, has failed to establish that the drastic and extraordinary remedy of the writ of mandamus is appropriate in this case. This Court's decision is guided by the five factors in Bowman. All five of those factors weigh in favor of denying the petition. First, with regard to the first and second factors, this Court's decision, as the Petitioner concedes in their brief in United States v. Gregor, says that in a choice of counsel issue, a defendant has a remedy available to them on direct appeal following conviction. There is no worry about the Petitioner being unable to demonstrate harm. Under Gonzales-Lopez, a choice of counsel issue is a structural error. Harm is assumed. That's a distinction from the cases on the civil side, Your Honors, where this Court has granted mandamus. On the civil side, however, there's no presumption of prejudice, and the Petitioner will not be able to prevail under the Court's analysis in those cases on direct appeal. Now, those are the first and second factors of the Bowman case, Your Honor, and those factors weigh in favor of denying the petition. Now, with regard to the other question about whether or not the district court erred or made a mistake in this case, the district court, in its substantial latitude and discretion in determining whether or not a conflict or a serious potential for conflict exists, did not err, Your Honors. The issue here is that Ms. Rasmussen represented a previous co-defendant in this case. The Petitioner, in their filings, represents that they received confidential communications and information from that previous defendant. They also represent to this Court and in the district court that they will call that defendant as a witness in their case and in their own defense. The conflicts there, Your Honors, it's potentially a Pandora's box of conflict. No one knows what Joel Axberg is going to say when he takes the stand. But let's say he becomes hostile to Mr. Carey, and Ms. Rasmussen is representing Mr. Carey, and she has impeachable information on Mr. Axberg from her previous representation of him. She can't use that information. Her loyalties will be divided between Mr. Carey and Mr. Axberg. And in the end of the day, Mr. Carey will suffer. That's a serious potential for conflict. In addition, Ms. Rasmussen received confidential communications, potentially or likely, about other government witnesses from Mr. Axberg. For example, say a government witness is on the stand, and he's testifying in the second trial, and Ms. Rasmussen hears him say something and says, jeepers, Mr. Axberg told me something about this when I represented him. She can't cross-examine that government witness. In that case, it's irrelevant, as the Petitioner attempts to point out in their brief, it's irrelevant that the defendants don't have antagonistic defenses, and in fact, it's the government's position they do have antagonistic defenses. It's also irrelevant that Mr. Axberg was acquitted. The fact of the matter is, is that Ms. Rasmussen owes a duty of loyalty to Mr. Axberg essentially until the day she finishes her profession. I'm not even sure it may be after Mr. Axberg's death. But she owes that duty of loyalty to him. It was- And the potentials that were obvious during the course of the last trial, when she at the approval of the Court represented a whole host of people. Well, the difference right now before this Court is that Ms. Rasmussen has said she received no confidential information or communications with regard to the representation as those other defendants in the district court. Well, did the Court – let me interrupt you. Did the Court know that every moment during that trial? Your Honor, I don't know. And without a hearing, does the district court know the extent of the things that you refer to as potential here? Without a hearing? I think that the district court would be able to, when it looks at it and says, there's a conflict here, a serious potential for conflict, it's those same conflicts that I'm highlighting and listing now that I think the district court would have considered. Well, you refer to a potential. So you say the Court knows about all these potential conflicts without a hearing? The Court said – I don't think that the Court needs a hearing to know about these conflicts. These are serious potential conflicts that could arise based on the Court's experience of hearing the trial, hearing Mr. Axberg testify, hearing Mr. Carey testify, having sat through the entire trial. It's aware of the arguments of the positions of the counsel in the case, of the parties in the case. And suppose during the course of the hearing, Mr. Axberg testifies, she can go ahead and represent anybody she wants. The Court's not required to accept that, Your Honor. I'm sorry? The Court's not required to accept that. Well, does the defendant in this case get an opportunity to present that kind of evidence if he has it? I believe that Ms. Rasmussen did represent that evidence to the Court in her motion for reconsideration. And so the Court did have that information before, but the Court, under United States v. Wheat, has the opportunity and the ability to deny or not accept such a waiver. And that was precisely what the Court implicitly did in denying the motion for reconsideration. Your Honor, I think part of the problem here is that we're in the area that Wheat talks about where it's murky, it's unknown, and the trial court is in the best position to determine what's going on. And to lay out sort of some of the problems here, originally Ms. Rasmussen filed as local counsel only. Local counsel in this case had not been coming to trial. Local counsel for Mr. Carey. They had the Court had authorized them not even to appear, not to be there, not to be there for jury selection. Then her position changes to where she would like to represent them in jury selection and various government witnesses. Throughout the hearing of this petition and the filing in this petition, her position has gone further. She would like to cross-examine or at least be available to cross-examine 41 government custodians. That's what the trial court was looking at. That's the framework. The pretrial murky area that the trial court was working in, attempting to define all of the potential conflicts of interest. And when the Court knew all of this information, on top of the Court's very real concerns about the joint defense agreement, that this joint defense agreement had been used to control and lead certain defendants around by Mr. Carey and by Mr.  Cohen, the Court was concerned that confidential information had been shared pursuant to this joint defense agreement, and Ms. Rasmussen, who previously represented one of these, for lack of a better word, lower-level defendants, that Mr. Axberg would now be being led around by Ms. Rasmussen and Mr. Cohen. Now, on this subject of being led around, if a lawyer for one defendant in a multi-defendant case can lead any other defendant around, that suggests to me that that other defendant isn't very well represented. And isn't this assertion that somebody is leading another co-defendant around a condemnation of the representation that those folks are getting? How can it be otherwise? I don't necessarily believe so, Your Honor, because I think what the Court was pointing out was that the confidential information that had been received by Attorney Cohen and had been through the joint defense agreement, it was not, I don't believe that the Court And this other guy is represented by a lawyer appointed by the Court that's supposed to be doing his or her job, and now we're to sit here and say, well, we think somebody leading this other guy around in a way that his lawyer is permitting, and we're going to prohibit it or prevent it by saying we're going to have certain lawyers that can be here and certain others that can't, after we've been afraid that everybody's been led around with the lawyers they have? I think what the Court was saying is that under this joint defense agreement, there's a duty of loyalty that goes out to all the other defendants, and that that duty of loyalty had been breached by Mr. Cohen through his usage of the information, and the district court was troubled by that. There is no hearing. No, no. Where is the evidence of that? The evidence that Mr. Cohen had utilized the information. I would submit that it would be the district court's findings. Where is the evidence? You mean the district court doesn't make evidence by its finding? And if he did use confidential information with the approval of everybody else who's sitting there listening to him, then it must be okay unless they object. Well, Your Honor, the trial court sat through the four-month trial. It witnessed all of that evidence. The trial court was aware of the joint defense agreement. We were not privy to any of the discussions relating to the joint defense agreement and the potential, the – where the defendants were brought in and asked about, did they know how much – that there could be a potential conflict. But we submit that the trial court was aware, and that is the evidence, Your Honor, and that's what those findings of fact set on. But, Your Honor, our point, the government's point is that putting aside the joint defense agreement, there are still very serious potential conflicts of interest in this case, Your Honor. That arises from the prior representation of Mr. Axberg, and that those are sufficient for this court to say, it's not clear on this record that the district court clearly erred, and that the writ of mandamus is not appropriate in this case. It is not an appropriate remedy. And with that, Your Honors, I would submit that the petition should be denied because it's an inappropriate vehicle to address this issue, unless the Court has any further questions. There don't appear to be any. Thank you. May it please the Court, Counsel Gregory Davis, for the appealee in the In re Cohen matter. First, I'm aware of the Cohen case. We would argue that this Court still needs to engage in a plain error review, and we don't believe that the error, that under Olano and under Rule 52b of the Federal Rules of Criminal Procedure, that the appellant has established that there was a showing an effect on his substantial rights. Now, putting that aside, since I suspect that that is not going to win me the day, let me move on. First, I believe in footnote 15 of the appellant's opening brief, it's now apparently clear that Poser Electric was a C corporation. So to the extent that they're saying that it's not clear, that's just clearing up matters for the Court. Well, the source of that is an Internet search of the record. No, that's a separate one. Footnote 15 is, apparently, Mr. Cohen was told by the special agent. That Poser Electric was a C corp. I just wanted to clear up the record, because appellant made the claim that there is nothing in no evidence. Oh, you're citing, you're citing to, you're citing to the appellant's brief. I'm citing to the appellant's brief. That's correct. I recall in the appellee's brief you have some. I did that as well, certainly. All right. Okay. I'm sorry. Go ahead. I think the Court correctly needs to focus on the questioning by Mr. Cohen at pages 47 and 51 to 54 of the excerpts of record. The district court at page 47 said, if you're attacking this gentleman's plea, you may not do that. The court's Mr. Cohen asks, may I ask a question. The court, you may ask a question, you may not ask about the validity of this gentleman's plea agreement. Nevertheless, page 51, actually page 50 is when Mr. Cohen once again starts inquiring into whether or not the plea agreement was valid, challenging the $250,000 loss. Essentially, then, did you the end of page 50, continuing to page 51, did you tell the person who prepared your tax returns that you lost $250,000 and might be eligible for a net operating loss carryforward? Answer, no, I didn't. Did you realize you might very well not even have a tax liability if you had correctly reported your deductions as end losses? Answer, I did not realize that. Mr. Cohen claims that that's relating to his knowledge of the tax laws, but if you look underneath and you realize that one of the elements of the offense to which Mr. Poser pled guilty was the existence of a tax liability, clearly Mr. Cohen is doing exactly what the district court told him not to do. That continues on pages 51 and 52 and on to 53. Why can't he attack that? Why can't he attack that plea? The plea isn't binding on him. And if he wants to attack that plea, and in truth, that is not a perfect plea, I don't know. Why can't he? Well isn't that fair game for a defendant accused by the sovereign of a crime? And the fact that the district court ruled that this is not an error, an area proper for cross-examination. But he didn't. Whether or not the district court was incorrect or correct or not, Mr. Cohen then continually violated the district court's ruling. But he doesn't say anything about the plea agreement. Well, he asked about tax liability. But if you can see the plea agreement is no good. Beg your pardon? He didn't suggest the plea agreement is no good. All he said was you may not have owed any taxes. Well, if you look at page 51, this relates to whether or not the court, page 20, well, he's agreed he had a tax liability. Based on his testimony here today, that he doesn't even have. If that's not an attack on the plea agreement, I don't know what it is. It's saying that he wasn't guilty. So he could not have properly pled guilty. Then if you continue on pages 52 and 53, if you're the district court is saying if you're trying to simply show he's continuing to attack the plea agreement, it says, the court says, if you're simply if you're trying to simply show the jury that this gentleman was deceived into a plea agreement, that's not relevant. And I would like to instruct the jury to disregard it. Just like I have instructed the jury you are not to consider it. When Mr. Cohan responds that he was going into concessions, the court points out that the points that the sections of the plea agreement he was referring to had nothing to do with concessions. There was nothing in those sections of the plea agreement that had anything at all to do with concessions that the government might have made. The court made it as clear as possible that you're not to attack the plea agreement. And that's exactly what Mr. Cohan was doing. It's my recollection of this, what I understand. The first person to mention an attack on the plea agreement was the judge. Am I right? I believe the did the did the did counsel ever assert that there was a plea agreement or that the plea that the plea was faulty in so many words? Not in so many words, but certainly inferentially and indirectly, that's exactly what his what his all of his questioning was doing. Okay. Now, just in terms of the treatment of the loss was not really something that was opened up by the government's direct examination. So this area of this area of questioning wasn't even the government never opened the door to questions about how you're going to treat the $250,000 tax loss. It wasn't relevant. It had nothing to do with whether or not Mr. Poser was credible. It wasn't an attack on credibility. What was the government's what this I'm not sure I understand what how we got into this how the government got into this in the first place. In I was just responding to something that Ms. Panner brought up. I don't understand, but the Poser was was a witness for whom? Poser was a government witness. Right. And this is on cross? That's correct. And what was the government on direct, what was it eliciting from Poser? Basically, it was a lot of Mr. Poser's testimony related to whether or not these were whether they were employees or independent contractors, because that that would that obviously affected whether or not Mr. Khari or Mr. Khari was going to be obligated for employer taxes and withholding taxes. Mr. As the appellant concedes, Mr. Poser never claimed that he was a part of the conspiracy. He was not being called in to discuss the conspiracy to discuss the alleged conspiracy. He was basically offering testimony as to whether or not people were being treated as independent contractors or employees. Didn't didn't this witness testify on direct examination that he went to his lawyer and told him he owed all that money and that was the reason why he fessed up to it? And that's why he pled guilty, because his lawyer told him he owed it all? Isn't there that was direct examination, was it not? That was one aspect. Well, of course, the district court, as the district court mentioned when it was doing the hearing, the district court said I was I sat there, I did the colloquy. I asked him if he was guilty.  No, I'm not talking about the plea. I'm talking about this man's testimony on direct examination. On direct examination, he said I went to my lawyer and my lawyer told me I had to pay taxes and then I pled guilty. Isn't that what he said? On direct or general help? That's a general overview of what he said. And that and and once he said that, then these questions come. Well, did you tell the person who prepared your tax return? Now, apparently, that's a different person than the lawyer. As I understand it. And he went and that was all in the context of that was the second or third question right after he had testified he lost $250,000, right? That he answered. I don't know the order, but it's in the same general area. Well, it's right there within a couple of questions. At least that's the way I remember it. Now, now he's in contempt for asking questions about that $250,000 and how to handle it, and he's accused of misleading or trying to mislead somebody, right? Yes. Now, is it your position that in the defense of a criminal case, a lawyer for the defense defendant cannot ask a question that is deliberately intended to mislead everybody in the courtroom? And if the government can present a case and a lawyer for the defendant can mislead a jury in such a way that they can get away with it, isn't that okay? As long as the lawyer doesn't make a representation to the judge or to the jury as to what the is in the form of a question. There's no representation of fact by this lawyer about whether it's Chapter S or, I mean, a C corp or an S corp or a C corporation. He just throws out a question there. What's wrong with that in the defense of a criminal case? One of the --- the problem is not just the question. The bigger problem is directly violating a district court's plain order, plain ruling, whether correct or incorrect, that you don't ask that question. He did it after he was -- even after being warned four times, he continued asking those questions. Now, he certainly might have had, had he been convicted, he probably would have -- he could have had an issue on appeal. But you don't deliberately disobey a district court even if the district court is wrong. That's not what --- Well, we don't even know that because we don't have a very good statement of why he was held in contempt. This gets to be a little bit circular. Circular. There's nothing else I can add, really, to it. All right. All right. I trust you feel we understand the record here. There's nothing any of us have said that is contrary to your understanding of the record, right? To the extent, as far, yeah, in terms of generally, in terms of order of when things were happening, I don't know that. Thank you. Thank you. I would suggest that the case should be remanded to let the district court do it correctly as the court as this Court did in the Cohen case. Very well. Thank you. In honor to or in answer to the Court's earlier question, Mr. Poser was represented by CJA counsel John McNicholas. The government's position here is that the district court is in the best position to decide whether or not I have a conflict. And actually, the case law, there's case law that I cited in the reply to the contrary. The defense lawyer is in the best position to decide whether or not there is a conflict or a potential conflict. Having said that, the district court gets it wrong in this case, even on the findings it does make. First, the district court says that I represented Mr. Cohen on the contempt case and on appeal, and that's why I can't represent Mr. Carey. Well, that's wrong. Ms. Panagakos represents Mr. Cohen. Next, the district court says that I was counsel for Mr. Axberg and I was appointed. That's correct, but there's no authority for the proposition that I can't now represent Mr. Carey as a retained client. Next, the district court says that I made misrepresentations and I told him I was not going to do any more criminal cases. That's false. I submitted to this Court, as Exhibits K, 1, and 2, the two motions to withdraw in the other two cases, Flatebo and Jordan, and it's clear from those motions and my declarations in those motions filed in completely unrelated cases that I said that my law firm had required me to complete my appointed cases, not my criminal cases. I didn't make any false statements to the Court. The district court was simply wrong. The district court said that I had outstanding CJA vouchers pending before it. I did not. My CJA vouchers were all paid in January, in fact, January 7th of 2008. The district court was wrong about that as well. And there's an affidavit from Mary Ann Boyle, an administrator from my office, it's Exhibit N, to the motion for reassignment that says that the bills had been paid. The district court simply makes erroneous rulings in this case and then summarily concludes that I can't appear as counsel for Mr. Carey. And the government is here telling us what my role as local counsel should be or would be. There is nothing about filing a notice of appearance or a substitution of counsel that requires me to set forth what I will do in a case. Frankly, I don't know where the government comes up with this concept of as local counsel she wasn't going to do anything anyway. Obviously, I was retained because I have experience with this case. I think that's clear. Kagan. We've given you as much time over as we can. Thank you. Thank you. Thank you. Your Honor, this is very brief. I think the government is here telling us that it's a C-Corp. Even the website wouldn't show whether it's a C-Corp or an S-Corp. That's an election made by the IRS. He wasn't attacking the validity of the plea agreement. He doesn't care whether the plea agreement's valid, which is inconsistent, just that there are inconsistencies. And the government did open the door. The $47,000 tax liability is testified to at page 30 of the direct. Thank you. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Leavy, Fairbank